# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JENNIFER FEATHER,

          **Plaintiff,**

      v.                            **Case No. 23-CV-1535**

WISCONSIN STATE FAIR PARK
POLICE DEPARTMENT, et al.,

          **Defendants.**

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### 1. Procedural History

Plaintiff Jennifer Feather brings gender discrimination and retaliation claims against the defendants. (ECF No. 15.) Defendants Wisconsin State Fair Park Police Department, Robert Malasuk, and Kenneth Pileggi have filed a motion for summary judgment. (ECF No. 40.) All parties have consented to the full jurisdiction of this court pursuant to 28 U.S.C. § 636(c). (ECF Nos. 10, 11.) The court has jurisdiction under 28 U.S.C. § 1331. The defendants' motion for summary judgment is ready for resolution.

## 2. Facts

The following facts are taken largely from the defendants' Proposed Finding of Facts (ECF No. 42) and Feather's additional Proposed Findings of Fact (ECF No. 49). Unless otherwise noted, the facts are undisputed.[1] The court reads all reasonable inferences in favor of Feather as the non-moving party.

Starting in May 2021 Feather worked for the State Fair Park Police as the administrative assistant to the Chief of Police. (ECF No. 50, ¶¶ 2, 11.) On April 24, 2022, Malasuk was appointed Interim Chief of Police and held that role until Pileggi took over as Chief a month later, on May 24, 2022. (ECF No. 50, ¶¶ 31–32, 35–36.)

On April 22, 2022, Malasuk approached Feather and said he "loved [her] body spray and it [made] him hot and bothered and he want[ed] to go home and do his wife." (ECF No. 53, ¶ 18 (quoting ECF No. 43-1 at 20 (Feather Deposition).) Sergeant Walter McCullough witnessed this and told Malasuk the comment was inappropriate. (ECF No. 53, ¶¶ 19-20.)

On May 2 or 3, 2022, Malasuk returned from a meeting with Chief Executive Director Shari Black and her Executive Assistant Rachel Micelli and told Feather that

---

[1] Many of Feather's responses to the defendants' proposed findings of fact state that the fact is "disputed," but Feather's responses often do not suggest a genuine dispute of the proposed fact. Her purported disputes are often unrelated to the proposed fact or seek only to add detail. (*E.g.*, ECF No. 50, ¶¶ 43, 58, 76, 92, 95, 100, 112, 124, 152, 172, 210.) Accordingly, Feather "fails to properly address [the defendants'] assertion of fact as required by Rule 56(c)," and "the court may…consider the fact undisputed for purposes of the motion." *See* Fed. R. Civ. P. 56(e). To the extent that the court recounts any such "disputed" facts as, in fact, undisputed, it reflects the court's conclusion that Feather failed to demonstrate that the proposed finding of fact is "genuinely disputed." *See* Fed. R. Civ. P. 56(c)(1)(B).

Black and Micelli were hot and he had a hard time controlling himself around them. (ECF No. 53, ¶ 23; ECF No. 50, ¶ 49.)

On May 10, 2022, Malasuk rubbed Feather's mid-back for two to three seconds until Feather shirked away and then engaged her in conversation. (ECF No. 53, ¶ 26.)

On May 24, 2022, the same day Pileggi started as Chief of Police, Feather went to Human Resources and verbally reported Malasuk to Chief Organizational Development Officer Samantha Dennis. (ECF No. 53, ¶¶ 28–30.) The parties dispute what exactly Feather reported. But it is undisputed that Feather reported the incident where Malasuk rubbed her back. (ECF No. 50, ¶ 60.)

After Feather told Dennis about Malasuk's conduct, Feather told Dennis that she did not want anything done and that she had dealt with similar situations throughout her career and could handle it herself. (ECF No. 53, ¶ 32; ECF No. 50, ¶ 77.) Feather claims, and the defendants dispute, that Dennis told her during this conversation that Malasuk had already tried to get her fired. (ECF No. 53, ¶ 33; *see also* ECF No. 43-1 at 134:11–15 (Feather Deposition).)

On May 25, 2022, Feather met with Pileggi to discuss her job duties. (ECF No. 50, ¶ 87.) Pileggi told Feather she needed to be a "mom" to all State Fair Park Police officers. (ECF No. 53, ¶ 38.) That same day Pileggi ordered the camera in the front office, near Feather's desk, to be covered, explaining that he did so because he wanted everyone to have a clean slate and to be trusted. (ECF No. 53, ¶ 42.)

On June 15, 2022, Malasuk told Feather she looked beautiful. (ECF No. 50, ¶ 91.) McCullough told Malasuk he should not make such statements, to which Malasuk told McCullough he looked beautiful, too. (ECF No. 53, ¶ 47.)

On June 20, 2022, Malasuk touched Feather's upper right arm for three to four seconds and then engaged her in conversation. (ECF No. 50, ¶ 94.)

Feather acknowledges that Malasuk's sexual harassment toward her ended in June 2022 (ECF No. 50, ¶ 97), but Feather identifies additional instances in which she claims Malasuk expressed hostility toward her. (ECF No. 53, ¶¶ 54–55, 58–60, 170–73 (alleging Malasuk was angry over scheduling, accused Feather of insubordination regarding a USB drive issue, and got angry when Feather did the assignments Pileggi ordered her to share with Malasuk).)

On November 2, 2022, Malasuk instructed Detective Jennifer Clemons to place electronic evidence on a USB drive for transmission to the District Attorney's office. (ECF No. 50, ¶ 103.) Department policy was to place evidence for internal storage purposes on CD-ROMs, in part because they are cheaper than USB drives. (ECF No. 50, ¶ 99.) But the District Attorney's office held a training where it made it clear to the police department attendees that it would not accept evidence submitted on CD-ROMs. (ECF No. 50, ¶ 101.) Malasuk attended this training; Feather did not. (ECF No. 50, ¶ 102.)

When Clemons asked Feather for a USB drive, Feather told her that the State Fair Park Police usually saved evidence on CD-ROMs but to do whatever her boss told her to

do. (ECF No. 50, ¶¶ 104–05.) Feather knew Malasuk had instructed Clemons to place evidence on the USB drive. (ECF No. 50, ¶ 108.) Feather talked to Pileggi about the USB drive request, noting the price difference between a USB drive and CD-ROM, and said that Clemons had requested a USB drive to inventory investigative photographs as evidence for internal storage purposes. (ECF No. 50, ¶¶ 106–07.) In fact, Clemons was preparing evidence to send to the District Attorney's office. (ECF No. 50, ¶ 112.) Unaware of the District Attorney's office new requirement that evidence was to be submitted on USB drives, Pileggi told Feather he was fine with using a CD-ROM instead of a USB drive. (ECF No. 53, ¶ 65.)

Malasuk learned that Feather would not give Clemons a USB drive to put evidence on and that Feather went to Pileggi about the issue. (ECF No. 53, ¶ 61.) Malasuk sent Feather an email noting that Feather went over his head about the USB drive issue, that he did not need to explain his decisions to her, that she was not in the meeting where the District Attorney's office discussed the preferred method of receiving evidence, and that he considered her act bordering on insubordination. (ECF No. 53 ¶¶ 58–60; ECF No. 48-8 (Malasuk email).) He stated, "[i]f I make a decision as a Police Inspector, you, an administrative Assistant have no authority to attempt to circumvent my authority" and, "[i]n the future, IF [sic] you don't like a decision I make, you have two options. Keep it to yourself or politely ask me why I made that decision, and I will determine if you have a

legitimate reason to be involved in my decision making process." (ECF No. 48-8 (Malasuk email); ECF No. 53 ¶ 60.)

Pileggi heard Feather say she was "done with this shit" and "was going to leave," prompting him to go to her desk, where he saw the email. (ECF No. 53 ¶ 62.) When Pileggi approached Feather, she said, "he hates me," "he's mean to me," and explained that she did what Pileggi asked her to do. (ECF No. 53 ¶ 63.) Feather also told Pileggi about each of the alleged sexual harassment incidents, to which Pileggi requested Feather submit a document titled "In the Matter Of" setting forth her allegations. (ECF No. 50, ¶¶ 123, 125.) The State Fair Park Police uses the "In the Matter Of" forms to document an aggrieved party's version of events within the department and to follow up on the allegations, if necessary. (ECF No. 50, ¶ 126–27.)

Feather also told Pileggi that Malasuk cheated on his eTIME test and that Sergeant Kenneth Yakel took the test on Malasuk's behalf. (ECF No. 50 ¶¶ 130–31.) The eTIME test is a test that State Fair Park Police employees were required to take and pass every two years. (ECF No. 50 ¶¶ 128–29; ECF No. 53, ¶ 75.) Part of Feather's job responsibilities included tracking employee compliance with the eTIME testing. (ECF No. 53, ¶ 75.) She and Yakel were responsible for administering the test, including getting officers into the testing system and giving them assistance during the exam. (ECF No. 53, ¶ 76; ECF No. 50, ¶ 131.) Pileggi told Feather he took this allegation very seriously and would fire someone who was untruthful about taking the eTIME test. (ECF No. 53, ¶ 74.)

During Feather's conversation with Pileggi on November 2 she told him, "I quit," to which Pileggi told Feather that he wanted to have a mediation with him, Feather, and Malasuk. (ECF No. 53, ¶ 77.)

Later in the afternoon on November 2 Feather completed an "In the Matter Of" form outlining her sexual harassment allegations against Malasuk and provided a hard copy to Pileggi, which she submitted via email on November 4. (ECF No. 53, ¶ 79.) Feather concluded the form by stating, "I am not comfortable having the mediation with Inspector Malasuk, but I felt that I had no choice." (ECF No. 43-6; ECF No. 53, ¶ 81.)

At some point prior to the mediation, Malasuk told Pileggi that Feather was untruthful about the USB drive situation, explaining that the evidence needed to be submitted to the District Attorney's office in accordance with their rules on submitting evidence. (ECF No. 50, ¶¶ 139–40.) Malasuk testified that, at this time, Pileggi also told him that Feather felt Malasuk was mean to her and did not like her. (ECF No. 50, ¶ 138.)

On November 3, Malasuk completed an "In the Matter Of" form about Feather's allegations that he was mean to her and did not like her, setting forth his own allegations against Feather regarding five incidents in which she was untruthful in the workplace. (ECF No. 50, ¶ 142; ECF No. 48-10.) Malasuk did not discuss any other allegations.

The morning of Friday, November 4, prior to the mediation, Pileggi met with Malasuk for fifteen to twenty minutes. (ECF No. 53, ¶ 90.) Pileggi testified that the conversation had nothing to do with Feather's complaint and was only about the USB

drive issue. (ECF No. 53, ¶ 90.) Feather saw this conversation, which made her feel uneasy and caused her to break out in hives. (ECF No. 53, ¶ 91.)

Around 8:00 A.M., Pileggi, Feather, and Malasuk met briefly for the mediation. (ECF No. 50, ¶ 145; *see also* ECF No. 53, ¶ 95.) They discussed the USB drive issue and nothing else. (ECF No. 50, ¶¶ 145–146; ECF No. 53, ¶ 92.) Feather contends that, at the end of the mediation, Malasuk explained the process going forward in which any employee who had questions needed to go directly to him. (ECF No. 53, ¶ 94.) Pileggi testified that Malasuk explained during the mediation "[t]hat the district attorney's office required thumb drives and that moving forward if the detectives had any kind of question about that, that [Feather] should direct their inquiries to [Malasuk]." (ECF No. 53, ¶ 94 (citing Pileggi Deposition, ECF No. 43-19 at 63:25–64:6).)

Feather also contends that Pileggi told her at the end of the mediation that Malasuk was "now her boss/supervisor." (ECF No. 53, ¶ 95; ECF No. 50, ¶ 150.) Pileggi testified that Feather was not told she would be reporting directly to Malasuk. (ECF No. 53, ¶ 95 (citing Pileggi Deposition, ECF No. 43-19 at 63:16–64:11.) The defendants further note that a change in supervisor requires certain procedural changes—including notifying Human Resources, updating internal systems, updating the employee directory, and issuing a letter to the employee notifying them of the change—none of which occurred here. (ECF No. 50, ¶¶ 153–55.)

Immediately following the mediation, at around 8:10 A.M., Pileggi met with Malasuk. (ECF No. 50, ¶ 161.) Defendants contend that, at this time, Pileggi informed Malasuk of Feather's verbal complaints against him, including that he sexually harassed her and that Yakel took Malasuk's eTIME test. (ECF No. 50, ¶ 162; *see also id.* (Feather contending that this conversation happened before the mediation, sometime between November 2 and 4).) Defendants also contend that, at this time, Pileggi ordered Malasuk to complete an "In the Matter of" form regarding Feather's allegations that he cheated on the eTIME test. (ECF No. 50, ¶¶ 167-68.) Malasuk submitted a completed form later that afternoon, denying Feather's sexual harassment allegations, addressing the USB drive issue, and explaining how he took the eTIME test with Yakel's assistance. (ECF No. 50, ¶ 174; ECF No. 43-18.)

After speaking to Malasuk, Pileggi called Yakel and informed him that he was investigating allegations Feather made that Yakel took Malasuk's eTIME test for him and asked Yakel to prepare an "In the Matter Of" form on the subject. (ECF No. 50, ¶ 171; ECF No. 53, ¶ 113.) Yakel completed a form, dated November 4, explaining how he assisted Malasuk with logging into his eTIME test and the topics on the test that they discussed. (ECF No. 50, ¶ 173; ECF No. 43-24.)

Sometime on November 4, while in Feather's presence, Pileggi reviewed Feather's "In the Matter Of" form regarding her sexual harassment complaint but did not discuss her allegations. (ECF No. 53, ¶ 96.) After scanning the form, Pileggi noted that it did not

9

include anything about Feather's allegation that Yakel took Malasuk's eTIME test for him, so Pileggi ordered Feather to complete an another "In the Matter Of" form identifying how she knew that. (ECF No. 50, ¶¶ 179, 186; ECF No. 53, ¶ 97.) Pileggi explained that, in addition to opening an investigation into her sexual harassment allegations, he opened an investigation into Malasuk's truthfulness regarding the eTIME test. (ECF No. 50, ¶ 180.)

Feather completed an "In the Matter Of" form regarding the eTIME test later that morning. (ECF No. 53, ¶ 99.) She left work after submitting the completed form, testifying that she did not feel comfortable working the rest of the day. (ECF No. 53, ¶ 99.) Feather's completed form stated the reasons she believed Yakel took Malasuk's eTIME test for him, but did not restate her conclusion that Malasuk cheated. (ECF No. 53, ¶¶ 100-04; *see also* ECF No. 43-4.) She stated that, "[o]n Wednesday, November 2nd 2022, I was very upset and began making statements regarding the things that Inspector Malasuk had been doing to me for months to Chief Pileggi. One of the things that I brought up was my thoughts of the etime test." (ECF No. 50, ¶ 192.) Feather testified that she did not specifically state in her "In the Matter Of" form that Yakel took Malasuk's eTIME test because she realized after the mediation she was "blowing up her world" and feared retaliation from Malasuk. (ECF No. 53, ¶ 104 (quoting Feather's deposition).) She also stated that she did not add that Yakel took Malasuk's test because she had already verbally told Pileggi that. (ECF No. 53, ¶ 105.)

On Sunday, November 6, Feather noticed that she was blocked on Facebook by a friend of Malasuk, Detective Rabine. (ECF No. 50, ¶ 221.) Feather decided to resign from the State Fair Park Police because she "realized it was over for her as this was going to become too stressful." (ECF No. 53, ¶ 115.) Feather also alleged that, at some point, a colleague told her she had been terminated. (ECF No. 50, ¶¶ 210, 212.) On Monday, November 7 at 7:28 am, Feather went to Human Resources and submitted her resignation. (ECF No. 50, ¶ 204.)

Pileggi had planned to place Feather on administrative leave pending the outcome of an internal investigation against Feather for untruthfulness. (ECF No. 53, ¶ 118.) He was going to provide Feather with a Notice of Internal Investigation, notifying her that she was being investigated for lying to him regarding an employee taking the eTIME test for another employee, along with five separate incidents of untruthfulness that were reported by Malasuk. (ECF No. 53, ¶ 119.) As part of this investigation, Pileggi had scheduled a follow-up interview with Feather for November 7, but Feather did not learn of the scheduled interview before she resigned. (ECF No. 50, ¶ 199.)

Despite Feather's resignation, Pileggi continued his investigation into Feather's untruthfulness and determined, without interviewing Feather, that she violated the State Fair Park Police policy regarding truthfulness standards. (ECF No. 50, ¶ 200.) Pileggi completed a Termination/Layoff Report that noted Feather resigned and stated he would

11

not recommend her for rehire because she was "not trustworthy," having lied about the eTIME test issue. (ECF No. 53, ¶ 120.)

### 3. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

"The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

### 4. Analysis

#### 4.1. Title VII Hostile Work Environment Claim

Feather claims that the State Fair Park Police discriminated against her on the basis of her gender by allowing Malasuk to create a hostile work environment. (ECF No. 15, ¶¶ 28–32; *see also* ECF No. 47 at 2).

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee on the basis of sex.[2] 42 U.S.C. § 2000e-2(a)(1). "An employer violates this provision when 'discrimination based on sex … create[s] a hostile or abusive work environment." E*qual Emp. Opportunity Comm'n v. Costco Wholesale Corp.*, 903 F.3d 618, 624 (7th Cir. 2018) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)).

To establish a gender-based hostile work environment claim under Title VII, a plaintiff must demonstrate that

> (1) her work environment was objectively and subjectively offensive, (2) the harassment she complained of was based on her gender, (3) the conduct was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment, and (4) there is a basis for employer liability.

---

[2] The court notes that Feather's complaint specifically alleges gender-based discrimination in violation of Title VII. (ECF No. 28, ¶¶ 28–32.) Although sex and gender are increasingly understood as distinct concepts, Title VII caselaw presently employs the terms interchangeably. *See Discrimination*, Black's Law Dictionary (12th ed. 2024) ("Increasingly in medicine and sociology, gender is distinguished from sex. Gender refers to the psychological and societal aspects of being male or female; sex refers specifically to the physical aspects."); *Miller v. Vesta, Inc.*, 946 F. Supp. 697, 702 (E.D. Wis. 1996) (noting that the Supreme Court has used the terms "gender " and "sex" interchangeably with respect to Title VII); *U.S. Equal Emp. Opportunity Comm'n v. Scott Med. Health Ctr.*, 217 F. Supp. 3d 834, 839 (W.D. Pa. 2016) (observing that much of the precedent interpreting Title VII conflates the terms "sex" and "gender").

*Anderson v. Street*, 104 F.4th 646, 652 (7th Cir. 2024) (quoting *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 880 (7th Cir. 2018)).

"In determining whether an actionable hostile work environment claim exists, the Court is to look at 'all circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Stitz v. Am. Fam. Mut. Ins. Co.*, 585 F. Supp. 3d 1187, 1191 (E.D. Wis. 2022) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

Feather alleges five incidents of sexual harassment by Malasuk: (1) his comment that he loved her body spray, which made him want to "do his wife" ; (2) his comment that he had a "hard time controlling himself" around two other female employees; (3) his rubbing of Feather's back and shoulder for two to three seconds; (4) his comment that Feather looked "beautiful" ; and (5) his touching of Feather's right upper arm for three to four seconds. (ECF No. 47 at 4–7.) Feather also points to Pileggi's instruction that she needed to be "everyone's mom." (*Id.* at 6.)

Feather attempts to incorporate several other alleged incidents of hostility that have no obvious or implied connection to her sex or gender. (ECF No. 47 at 6–14 (discussing Pileggi's coverage of her desk camera, Malasuk's involving her in his attempt to help a private connection recover a stolen vehicle, shift scheduling, the USB drive dispute, etc.).) In *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001), the Seventh

Circuit held that harassing behavior that was not based on sex or gender is not actionable as a Title VII discrimination claim. The court clarified that even conduct carried out in retaliation for an employee's complaint of sexual harassment "is 'too remote a connection' to gender to convert the retaliatory harassment into gender-based harassment." *Berry*, 260 F.3d at 811 (noting retaliation is a distinct claim from harassment). Feather has not advanced any material, admissible evidence[3] suggesting that the alleged hostile acts that occurred after June 2022 were based on her gender. Therefore, the court will not consider any of these additional allegations for purposes of evaluating Feather's hostile work environment claim.[4]

The six alleged relevant incidents (five involving Malasuk and one involving Pileggi), even weighed cumulatively, do not rise to the level of a severe or pervasive degree of harassment. Feather argues that the incidents violated the State Fair Park Police policy (ECF No. 47 at 3–8), but a violation of workplace policies is not the same as a violation of Title VII. Although the alleged conduct may have been unprofessional and inappropriate, caselaw within the Seventh Circuit has held that more severe and frequent incidents did not amount to a hostile work environment. *See, e.g.*, *Wheeler v. Brady Corp.*, 712 F. Supp. 2d 801, 821–24 (E.D. Wis. 2010) (finding conduct was not sufficiently severe

---

[3] Feather alleges that other individuals accused Malasuk of inappropriate behavior (*see* ECF No. 53, ¶¶ 10–14), but these allegations are not relevant to whether Malasuk discriminated against her.

[4] Even if the court considered all of the alleged irrelevant acts of hostility in combination with the sexual harassment allegations, the cumulative effect would still not be so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment.

where harasser allegedly touched employee below her mid-calf, asked if she shaved for him, told her she was beautiful, asked whether she had been in a lesbian relationship, asked whether she had any naked photographs of herself while pregnant, asked what her favorite sexual positions were, made loud kissing noises in her cubicle, hoping other employees would believe they were having an affair, extended her multiple dinner invitations, and gave her an unwanted kiss on the lips).

Malasuk's unsolicited comments about Feather and other women, while perhaps off-putting, did not rise to an actionable degree. *See Anderson*, 104 F.4th at 652 ("'[O]ff-color comments, isolated incidents, teasing, and other unpleasantries' are not enough for a Title VII sexual harassment claim." (quoting *Swyear*, 911 F.3d at 881). The same is true of Pileggi's comment that Feather should act as a mom to her co-workers. *See Stitz*, 585 F. Supp. 3d at 1191 ("Title VII … is not a 'general civility code' and courts will not find liability based on the 'sporadic use of abusive language.'") (quoting *Ford v. Minteq Shapes & Servs., Inc.*, 587 F.3d 845, 848 (7th Cir. 2009)).

As for Malasuk's statements about wanting to "do his wife" and not being able to control himself around two other co-workers who were not present when he made the statement, "when harassment is 'directed at someone other than the plaintiff, the impact of [such] second-hand harassment is obviously not as great as the impact of harassment directed at the plaintiff.'" *Equal Emp. Opportunity Comm'n v. Vill. at Hamilton Pointe LLC*,

102 F.4th 387, 402 (7th Cir. 2024) (quoting *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 567 (7th Cir. 2004)).

As for Malasuk's unwelcome touching, the Seventh Circuit has held that "[t]here are some forms of physical contact which, although unwelcome and uncomfortable for the person touched … typically will not be severe enough to be actionable in and of themselves." *Wheeler*, 712 F. Supp. 2d at 823 (quoting *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000)). "A hand on the shoulder, a brief hug, or a peck on the cheek lie at this end of the spectrum." *Swyear*, 911 F.3d at 882 (quoting *Hostetler*, 218 F.3d at 808). "Even more intimate or more crude physical acts—a hand on the thigh, a kiss on the lips, a pinch of the buttocks—may be considered insufficiently abusive to be described as 'severe' when they occur in isolation." *Id.* (quoting *Hostetler*, 218 F.3d at 808).

Feather's allegations of being touched on two occasions, once on her back and once on her arm for three or four seconds each, even considered in combination with Malasuk's comments, plainly lie on the non-actionable end of the spectrum. *See Cooper v. Eaton Corp.*, 498 F. Supp. 3d 1053, 1065–66 (N.D. Ind. 2020) (citing the *Hostetler* holding in granting summary judgment for the defendant on a claim that a male coworker poked a female coworker several times around her waistline, bra line, and possibly touched her breast).

Feather further contends that Pileggi's facilitation of the mediation and reassignment of Feather to Malasuk's supervision created a sexually hostile environment

as a matter of law. (ECF No. 47 at 18 (citing *Adusumilli v. City of Chi.*, 164 F.3d 353, 361 (7th Cir. 1998).) But she misstates the holding in *Adusumilli*, wherein the Seventh Circuit found that the employer's assignment of the plaintiff to work near the individual she accused of harassment did *not* create a hostile work environment as a matter of law because the accused did not engage in severe or pervasive harassment. *See* 164 F.3d at 362.

At a minimum, no genuine dispute of material fact exists as to the requirement that the harassment be so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment. *See Stitz*, 585 F. Supp. 3d at 1191. Accordingly, the court will grant the defendants' motion for summary judgment on Feather's Title VII hostile work environment claim.

### 4.2. Title VII Retaliation Claim

Feather claims that the State Fair Park Police retaliated against her for engaging in protected activity under Title VII. (ECF No. 15, ¶¶ 33–38; *see also* ECF No. 47 at 24).

"Title VII prohibits employers from retaliating against employees for complaining about unlawful employment practices." *Kedas v. Ill. Dep't of Transp.*, No. 22-2775, ___ F.4th ___, 2025 WL 2304050, at *3 (7th Cir. Aug. 11, 2025) (citing 42 U.S.C. § 2000e-3(a); *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006)). "To prevail on a Title VII retaliation claim, the plaintiff must prove that (1) she engaged in an activity protected by the statute; (2) she suffered an adverse employment action; and (3) there is

a causal link between the protected activity and the adverse action." *Anderson*, 104 F.4th at 654.

If the plaintiff establishes a prima facie case of retaliation, the defendant "must then offer a legitimate, nondiscriminatory reason for its adverse action." *Brooks v. City of Pekin*, 95 F.4th 533, 539 (7th Cir. 2024). "If the employer has offered a nondiscriminatory explanation for its action, a Title VII claim turns on whether there is sufficient evidence for a reasonable jury to conclude that the explanation is pretext for illegal discrimination or retaliation." *Upchurch v. Indiana*, 146 F.4th 579, 587 (7th Cir. 2025). "Pretext is a lie, specifically a phony reason for some action, not just faulty reasoning or mistaken judgment on the part of the employer." *Id.* (cleaned up) (quoting *Napier v. Orchard Sch. Found.*, 137 F.4th 884, 892 (7th Cir. 2025)).

Feather contends that her complaint to Pileggi on November 2, 2022, is the protected activity underpinning her retaliation claim. (ECF No. 47 at 25.) On that date, Feather told Pileggi that Malasuk had been engaging in sexist acts—specifically, the five incidents outlined in the prior section of this decision regarding a hostile work environment. (ECF No. 53, ¶¶ 68–71; *see also supra* at 14.) Feather alleges that she thereafter faced three adverse employment actions in retaliation for her complaint to Pileggi: (1) the State Fair Park Police failed to stop the harassment or investigate it; (2) she was placed under the direct supervision of her alleged harasser, Malasuk; and (3) she was constructively discharged. (ECF No. 15, ¶¶ 35–37; ECF No. 47 at 27.)

To constitute an "adverse employment action" for purposes of a Title VII retaliation claim, the "challenged action must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Lewis v. City of Chi.*, 496 F.3d 645, 655 (7th Cir. 2007) (quoting *Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 459 (7th Cir. 2007)). Such actions include "changing the conditions in which [an employee] works … in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment." *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017) (internal quotations omitted) (quoting *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002)).

### 4.2(a) Failure to Stop Harassment

Feather's contention that the State Fair Park Police failed to stop the harassment is not an adverse employment action; Feather does not allege any change or alteration to her working conditions that could have been motivated by her complaint. *See Alamo*, 864 F.3d at 552 (describing an adverse employment action as "a materially adverse *change* in the terms and conditions of employment…") (emphasis added).

### 4.2(b) Supervisory Reassignment

As for Feather's alleged placement under Malasuk's direct supervision, the defendants contend that no reasonable jury could believe this reassignment happened.

(ECF No. 41 at 39.)[5] According to the State Fair Park Police's organizational chart, Feather

reported directly to the Chief of Police (Pileggi) and not to Malasuk. (ECF No. 50, ¶ 17.)

The defendants point out that no formal steps were taken to change that reporting

structure. (ECF No. 41 at 39 (citing undisputed fact findings (ECF No. 50, ¶¶ 17, 151)

about the lack of changes to the State Fair Park Police's chain of command, as well as

Feather's job duties and description).) Even so, Feather stated during her deposition that

Pileggi told her at the end of the mediation on Friday, November 4, that Malasuk was

now her boss. (ECF No. 43-1 at 116:18–20.) Feather resigned the following Monday. (ECF

No. 50, ¶ 204.) Given that short period of time, the lack of documentation regarding the

reassignment would not necessarily preclude a reasonable finder of fact from concluding

that Pileggi did impose a new requirement that Feather report to Malasuk and that such

a requirement constituted a significantly negative alteration in Feather's workplace

conditions. Accordingly, a genuine dispute of material fact exists as to whether Pileggi

reassigned Feather to Malasuk's direct supervision.

The alleged reassignment occurred only two days after Feather complained to

Pileggi about Malasuk's conduct. (ECF No. 53, ¶¶ 62, 68, 92, 95.) "[T]he timing of an

employee's [adverse employment action] may be circumstantial evidence of a retaliatory

motive," if the adverse action occurred "fairly soon after the employee's protected

---

[5] Citations in this decision are to the page numbers provided by ECF, not the page numbers listed at the bottom of the parties' filings.

expression." *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009–10 (7th Cir. 2000) (citations omitted). Given the temporal proximity of Feather's complaint and the alleged reassignment, a reasonable fact finder could infer a causal relationship between the two events.

Therefore, if Feather was reassigned, a reasonable fact finder could conclude that she established a prima facie claim for retaliation. The defendants do not offer any legitimate, nondiscriminatory reason that Pileggi might have for reassigning Feather to Malasuk's supervision. (*See* ECF Nos. 41, 51.) In light of the factual dispute, the court will deny the defendants' motion for summary judgment with respect to the reassignment theory of Feather's retaliation claim.

### 4.2(c) Constructive Discharge

As for Feather's allegation that she faced an adverse employment action in the form of constructive discharge, the Seventh Circuit has recognized two types of constructive discharge. *See Fields v. Bd. of Educ. of City of Chi.*, 928 F.3d 622, 625 (7th Cir. 2019). "The first occurs when a plaintiff resigns due to discriminatory 'working conditions even more egregious than that required for a hostile work environment claim.'" *Id.* (quoting *Wright v. Ill. Dep't of Child. and Fam. Servs.*, 798 F.3d 513, 527 (7th Cir. 2015). "The second occurs when an employer acts in a manner that would make clear to a reasonable employee that she will be immediately fired if she does not resign." *Id.* (citation omitted).

Because Feather could not establish a hostile working environment (*see supra* at 18), she cannot establish that she was subject to working conditions that support the first type of constructive discharge. *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004) ("Because Herron failed to establish a hostile work environment, his claim for constructive discharge also must fail.").

Nor can Feather establish the second type of constructive discharge. Nothing in the record suggests that, before she resigned, her employer gave her reason to believe she was going to be fired. Feather states she knew that Pileggi was going to suspend and fire her because he said so during his deposition related to this lawsuit. (Feather Deposition, ECF No. 43-1 at 143:14–20.) But she did not know that at the time she resigned. Although Feather claims Dennis told her that Malasuk had tried to get her fired when she reported Malasuk's behavior to Dennis in May (*see* ECF No. 53, ¶ 33; ECF No. 43-1 at 134:11–15), nothing about that conversation suggests that Feather knew she would be fired if she did not resign in November.

Feather claims that a colleague told her on November 8 (the day after her resignation) that she had heard Feather had been fired. (ECF No. 50, ¶¶ 210, 212; ECF No. 43-1 at 207:2–23.) But, again, this rumor came to light after Feather resigned. The record reflects that, prior to her resignation, Feather knew only that Pileggi was investigating her allegations and collecting "In the Matter Of" forms, not that Feather was being investigated for any reason.

For all of the foregoing reasons, the defendants are entitled to judgment as a matter of law with respect to two of Feather's three arguments for retaliation (failure to stop harassment and constructive discharge). Because a genuine dispute of material fact exists as to whether Pileggi reassigned Feather to Malasuk's direct supervision in retaliation for Feather's report against Malasuk, the retaliation claim will survive in that respect.

### 4.3. Section 1983 Equal Protection Claim

Feather claims Malasuk violated the Equal Protection clause by subjecting her to a hostile work environment due to her gender. (ECF No. 15 at 8; ECF No. 47 at 28–31.)

"To establish liability under § 1983 for sexual harassment, [the plaintiff] must establish the same categories of evidence as under Title VII—that she was subjected to unwelcome sexual conduct, because of her gender, and that the conduct was severe or pervasive enough to create a hostile work environment." *Chaparro v. City of Chi.*, 47 F. Supp. 3d 767, 781 (N.D. Ill. 2014). Because Feather's Equal Protection claim parallels her unsuccessful Title VII claim, she cannot establish a violation of the Equal Protection clause. Accordingly, the defendants' motion for summary judgment on Feather's Equal Protection claim will be granted.

### 4.4. § 1983 First Amendment Retaliation Claim

Feather claims that Pileggi and Malasuk violated her First Amendment rights by retaliating against her for complaining of Malasuk's sexual harassment. (ECF No. 15 at 9; ECF No. 47 at 31–39.)

To establish a prima facie case of First Amendment retaliation, Feather must show: "(1) [she] engaged in constitutionally protected speech; (2) [she] suffered a deprivation likely to deter [her] from exercising [her] First Amendment rights; and (3) the speech was a motivating factor in the employer's adverse action." *Fehlman v. Mankowski*, 74 F.4th 872, 875 (7th Cir. 2023).

"Whether a public employee's speech is protected turns first on whether the speech was made in the employee's capacity as an employee or as a private citizen." *Fehlman*, 74 F.4th at 875. The determination of whether speech is constitutionally protected is a question of law. *Kubiak v. City of Chi.*, 810 F.3d 476, 481 (7th Cir. 2016). A public employee's statements made "pursuant to their official duties" are not made as a citizen for First Amendment purposes and do not garner constitutional protection from employer discipline. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006); *Fehlman*, 74 F.4th at 875. An employee's "official duties" are broader than her job description; the determination is "a practical inquiry into what duties [the employer expects] the employee … to perform." *Kubiak*, 810 F.3d at 481 (quoting *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008)); *Fehlman*, 74 F.4th at 875. "Employees' statements about 'misconduct affecting an area within [their] responsibility' are considered official-capacity speech even if those employees are not ordinarily responsible for investigating misconduct." *Fehlman*, 74 F.4th at 875 (quoting *McArdle v. Peoria Sch. Dist. No. 150*, 705 F.3d 751, 754 (7th Cir. 2013)).

No matter how important the speech is to the public interest, if the speech is made pursuant to the employee's official duties, it is not protected by the First Amendment. *Fehlman*, 74 F.4th 872, 877. "The distinction is important because 'while the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance.'" *Olendzki v. Rossi*, 765 F.3d 742, 747 (7th Cir. 2014) (quoting *Garcetti*, 547 U.S. at 420).

Feather contends that, in reporting Malasuk's sexual acts to Pileggi on November 2, she was bringing wrongdoing to light and thus engaged in protected speech. (ECF No. 47 at 34–35.) The defendants argue that Feather was speaking as an employee and thus was not engaged in protected speech, noting that she was required to report harassment and reported it up the chain of command accordingly. (ECF No. 41 at 50, 59–61.)

As the Seventh Circuit noted in *Houskins v. Sheahan*, "the internal complaint … is an obvious form of speech made pursuant to official duties under the *Garcetti* standard; it would require mental gymnastics to see it otherwise." 549 F.3d at 489; *see also Olendzki*, 765 F.3d at 747–48 ("[Plaintiff's] statements [reporting an assault by a corrections officer] … were clearly an employee grievance, speech that the First Amendment does not protect."). Department policy required Feather report sexual harassment. (ECF No. 50, ¶¶ 19–21, 27.) She reported Malasuk's sexual harassment up the chain of command, first to Human Resources and later to her supervisor, Pileggi. (ECF No. 50,

¶¶ 27, 60, 123; *see also* ECF No. 50, ¶ 225 (Feather alleged she was "pursuing the internal complaint process set by [the State Fair Park Police] to address workplace sexual harassment").) Such internal reporting of wrongdoing is consistently held to be employee speech and not constitutionally protected. *Garcetti*, 547 U.S. at 420; *Houskins*, 549 F.3d at 489; *Olendzki*, 765 F.3d at 747–48; *Kubiak*, 810 F.3d at 481–82 (finding that, "[g]enerally, an employee who is verbally assaulted by a colleague would be expected to report the inappropriate behavior to a supervisor[,]" especially in the context of a police department); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1091 (7th Cir. 2008) ("[R]eports by government employees to their superiors concerning alleged wrongdoing in their government office [a]re within the scope of their job duties."); *Balder v. Meeder*, No. 19-CV-7928, 2022 WL 2340874, at *4, 2022 U.S. Dist. LEXIS 114934, at *11 (N.D. Ill. June 29, 2022) (collecting cases and noting that "the Seventh Circuit has ruled on multiple occasions that a public employee speaks pursuant to her official duties when she reports internal misconduct through only internal channels").

The circumstances of Feather's statements further support that she spoke as an employee rather than as a private citizen because "her speech was intimately connected with her job." *Kubiak*, 810 F.3d at 482; *see also Fehlman*, 74 F.4th at 876 (noting that the circumstances of the speech, which addressed internal issues during a closed meeting, supported that the speech was made as an employee). Feather's complaint concerned harassment by a fellow State Fair Park Police employee, which occurred in the workplace

and during working hours. She directed her complaint to her supervisor. This complaint "reflected an employee's attempt to improve her work environment so that she would not be harassed again." *Kubiak*, 810 F.3d at 482; (ECF No. 50, ¶ 224 (Feather testified that her goal in reporting Malasuk's conduct was absolutely to stop the harassment).)

Accordingly, the court finds that Feather did not engage in constitutionally protected speech. "Therefore, [the court] need not consider whether [she] can establish the other necessary elements, or whether the defendants are entitled to qualified immunity." *Bivens v. Trent*, 591 F.3d 555, 559-60 (7th Cir. 2010); *see also Garcetti*, 547 U.S. at 418 ("[Courts] first … determine[e] whether the employee spoke as a citizen on a matter of public concern[;] [i]f … [not], the employee has no First Amendment cause of action based on … her employer's reaction to the speech." (citation omitted)).

The defendants' motion for summary judgment on Feather's First Amendment claim will be granted.

**5. Conclusion**

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (ECF No. 40) is **GRANTED IN PART AND DENIED IN PART**. Feather's retaliation claim based on her theory of supervisory reassignment shall survive. The defendants are entitled to judgment as a matter of law with respect to all other claims.

The Clerk shall schedule a status conference to address how the case will proceed.

[signature page follows]

Dated at Milwaukee, Wisconsin this 19th day of September, 2025.

WILLIAM E. DUFFIN
U.S. Magistrate Judge